IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KATHY C. GRUBBS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-097-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Kathy C. Grubbs ("Claimant"), pursuant to 42 U.S.C. § 405(g), requests judicial review of a final decision of the Commissioner ("Commissioner") of the Social Security Administration, denying her application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED**.

**Claimant's Background**

Claimant was 53 years old at the time of the hearing before the ALJ on February 12, 2009. (R. 23-51). Claimant left school prior to completing the seventh grade. (R. 48). For most of her adult life, Claimant was a housewife, though she had worked as a housekeeper and molder/machine feeder and served as a foster parent. (R. 28-33). Claimant testified her inability

to work was caused by degenerative disk disease, degenerative joint disease, cardiac problems and depression. (R. 27, 39-40).

Claimant testified that she endured chronic pain due to degenerative disk disease. (R. 35, 39). She testified that the disease caused her to have pain in her legs, which had increased to the point where she was in continuous pain, with pain starting at her hip and radiating down to her feet. (R. 35, 37-38). Claimant described the pain as achy and sharp. *Id.* Claimant further described her feet as staying hot and feeling like her legs were asleep. (R. 37). Claimant complained of lost strength in her legs and being unable to control them. (R. 35). She also complained of leg cramps that caused her pain and made it difficult for her to sit. *Id.* She took pain medication and had to lie down when she was no longer able to tolerate her pain. (R. 37-38).

Claimant also testified that the degenerative joint disease caused her pain in her back and arms, with her arms aching and feeling weak. (R. 43-44). She suffered occasions of "unbearable" shoulder pain. (R. 43). Claimant testified the problems with her arms caused her difficulty with gripping and dropping things. (R. 43-44). Repetitive motion made Claimant's hands hurt and ache. (R. 44). On occasion, while driving, her hands seized up and she lost control of them. *Id.* She said the heaviest item she could lift was a half-gallon of milk. (R. 44).

Claimant testified that she suffered dizziness and vertigo since a heart attack in 2006. (R. 39-40). She claimed to suffer dizzy spells two to three times a week. (R. 40). Being dizzy made Claimant feel nauseated as though she might pass out. *Id.* She had chest pain that caused her to be short of breath and unenergetic. (R. 41). She experienced shortness of breath on exertion. *Id.* She said that loading the dishwasher and walking 100 feet to her mailbox caused her to be short

of breath. (R. 42). Claimant testified that Dr. Childs at the Salina Clinic at the Cherokee Nation had her take an aspirin a day for her heart condition. (R. 45). Claimant also said that she was prescribed Prozac by a psychiatrist, Colleen Springer,[1] at the same clinic. (R. 46).

Claimant described herself as being very active in the past and said that she had enjoyed helping people and working. (R. 35, 42). Her physical limitations left her unable to do the things she used to do. *Id.* She testified that her attendance at the hearing would cause her difficulty to the point that she would have to go home afterwards to take a pill that would knock her out. (R. 42).

Claimant was transported via ambulance to the Emergency Room at the Mayes County Medical Center on August 7, 2000. (R. 167-72). At that time, she complained of chest pain and pressure, nausea, and sweats. (R. 167). She reported that she had been experiencing left-sided chest pain for about a month. *Id.* Her blood pressure was recorded by the nurse as 154/95, and other blood pressure recordings were 142/92, 136/68 and 129/78. (R. 167, 172). However, other than noting post-surgical changes from a previous bypass surgery, Claimant's chest x-ray was normal. (R. 171).

On February 27, 2006, a CT of Claimant's chest, abdomen and pelvis revealed benign-appearing calcified right lung granulomas and a left cortical cyst of increased size. (R. 204-05). In comparison to a CT from October 2001, there was increased post-inflammatory scarring of the right kidney. *Id.* The CT also revealed the "heart size is normal with no pericardial effusion. Calcified atherosclerotic changes of the coronary vessels are noted." (R. 204).

---

[1] It is noted by the undersigned that Ms. Springer is not a psychiatrist, but appears to be a counselor with an MSW. (R. 333).

On June 22, 2006, Claimant presented to the Emergency Room at Claremore Indian Hospital complaining that she was weak and shaky, and had been experiencing chest pressure. (R. 174). Claimant reported that two days earlier, she had felt weak with sharp pain in her chest lasting four minutes, with pain into her left arm, as well as dizziness and headache. *Id*. The records reflect negative cardiac enzymes, and an electrocardiograph ("EKG") performed showed she had normal sinus rhythm. (R. 174-75). A chest x-ray conducted on June 22, 2006 was similar to one from March 5, 1999 and evidenced normal heart size, no acute disease, a prior left thoracotomy[2] and healed granulomatous disease. (R. 180).

Claimant presented to Sam Hider Jay Community Clinic on October 30, 2006 complaining of chest pain, bilateral leg pain, left arm pain, weakness, and shortness of breath. (R. 190). She was additionally seen for a mass on her right breast. *Id*. The results of a chest x-ray indicated "[n]o acute infiltrates, effusions or soft tissue masses. . . Heart is not enlarged and bony structures are intact" and "no acute chest disease." (R. 203). At a follow-up visit on November 15, 2006, Claimant was evaluated for ischemia secondary to her complaints of chest pain and underwent an adenosine cardiolite. (R. 188, 202). The adenosine cardiolite was completed "without chest pain or EKG changes" and the images showed "no areas of fixed deficit or redistribution indicative of low probability of significant coronary artery disease." (R. 202).

Claimant had a mammogram and bilateral breast ultrasound on December 14, 2006. (R. 186, 199-201, 241-43). The results showed she had mild benign bilateral ductal dilation, but without intraluminal masses or suspicious shadowing. (R. 200, 242). The radiologist

---

[2] A thoracotomy is a "surgical incision of the chest wall." Taber's Cyclopedic Medical Dictionary 1985-86 (17th ed. 1993).

recommended correlation with clinical findings of palpable mass to determine if a surgery referral was warranted. (R. 200, 243).

On March 7, 2007, Lawerence C. Brotherton, Jr., M.D., provided a consultation for surgical evaluation of Claimant's bilateral breast masses. (R. 236-39). Dr. Brotherton's report indicates that Claimant was self-employed. (R. 237). Claimant reported a history of fatigue, chest pain, pain in legs and hips with exercise, shortness of breath with exertion, arthritis, intermittent numbness, and herniated discs. (R. 237-38). Upon examination, Dr. Brotherton noted Claimant was "a well-nourished, well-developed [woman]. . . in no apparent distress," and she moved "all extremities well to command." (R. 238). Dr. Brotherton noted Claimant had a "history of breast cancer by self report, although it appears all that she had done was an excision with no chemotherapy or radiation." (R. 239).

Unable to adequately palpate the masses, Dr. Brotherton scheduled Claimant for additional diagnostic screening and core needle biopsies. (R. 239). An ultrasound of her breasts showed an area of palpable abnormal mass in her right breast. (R. 272-73). Further evaluation of the right breast by MRI showed the mass was benign. (R. 269). Results of a chest x-ray revealed that Claimant had a couple of small pulmonary nodules in her lungs. (R. 270). After completing the additional testing, on June 1, 2007, Claimant told Dr. Brotherton that she wanted to undergo excisional biopsy of the benign bilateral breast masses. (R. 231-32). Dr. Brotherton referred Claimant to a cardiologist for cardiac clearance prior to performing surgery. *Id*.

Claimant presented to Dr. Robert Sweeten, on June 13, 2007, for a routine check up on her blood pressure. (R. 218). At that time, Claimant reported that her legs hurt and that they felt restless and weak. *Id.* Dr. Sweeten diagnosed Claimant with hypertension, gastritis, and restless

leg syndrome. *Id*. He noted that Claimant's weight had increased approximately 20 pounds since December 2006, and he diagnosed her as being overweight. *Id.* Dr. Sweeten started her on samples of Requip for restless leg syndrome. *Id.*

Edward J. Morris, MD, of Cardiology of Tulsa, performed Claimant's pre-surgical cardiac evaluation on June 22, 2007. (R. 225-27). Claimant told Dr. Morris that she had an occasion in 2006 of chest discomfort that made her weak and that she had been weak ever since. (R. 225). She reported that she experienced chest pain lasting several seconds, with some pains lasting up to 4 minutes. *Id*. She said that she had weakness and cramping in her legs from walking ½ a block. *Id*. Under "Social History," Dr. Morris noted Claimant was unemployed but "has an active lifestyle." *Id*. In review of her systems, Dr. Morris noted that Claimant reported weight gain, dyspnea[3], edema, claudication[4], acid reflux, nocturia[5], dizziness, and symptoms of depression. (R. 225). Results from Claimant's EKG were normal. (R. 227). Dr. Morris diagnosed Claimant with chest pain, unspecified, and ongoing tobacco abuse. (R. 226). He additionally diagnosed that Claimant had benign hypertension, noting that her symptoms were reasonably well controlled. *Id*.

On June 28, 2007, Claimant reported to Dr. Sweeten that she continued to have leg pain, including a "burning" sensation. (R. 251). Dr. Sweeten's handwritten notes appear to question

---

[3] Dyspnea is "air hunger resulting in labored or difficult breathing, sometimes accompanied by pain." Taber's Cyclopedic Medical Dictionary 593 (17th ed. 1993).

[4] Claudication is defined as "lameness or limping. It is a severe pain in calf muscles occurring during walking but subsides with rest." Taber's Cyclopedic Medical Dictionary 398 (17th ed. 1993).

[5] Nocturia is urination, especially excessive, during the night. Taber's Cyclopedic Medical Dictionary 1314 (17th ed. 1993).

whether Claimant had neuropathy. *Id*. He prescribed Lyrica for pain and the anti-depressant Cymbalta.⁶ *Id*. Claimant told Dr. Sweeten on July 30, 2007, that the Cymbalta was not helping. (R. 250).

Dr. Morris evaluated Claimant for symptoms of hypertension on August 22, 2007. (R. 265-67). Dr. Morris noted that Claimant was doing well and felt better. (R. 265). Claimant had been using Chantix, and she had reduced the number of cigarettes she smoked a day. *Id.* She continued to report problems with atypical chest pain. *Id*. Despite Claimant's self- report of sustaining a heart attack in 2000, Dr. Morris noted that he reviewed Claimant's records that showed Claimant did not, in fact, suffer from a heart attack and that the EKG and stress test were unremarkable. (R. 265, 267). As before, Dr. Morris noted that Claimant had "an active lifestyle." (R. 265). Claimant's medications were listed as Chantix, Lisinopril, Requip, Aspirin, and Ranitidine Hcl. (R. 266). Dr. Morris diagnosed Claimant with chest pain, unspecified; ongoing tobacco abuse; and well-controlled hypertension. *Id.*

At Dr. Morris' referral, Claimant participated in a Myocardial Perfusion Imaging Study and EKG on September 5, 2007. (R. 264, 266). After walking for a little over four-and-a-half minutes, the test was stopped due to dyspnea and fatigue. (R. 264). The results reflected no significant arrhythmias at either baseline or during recovery, no ischemic changes at peak exercise and normal and/or undilated ventricles. *Id.* Dr. Morris subsequently gave Claimant clearance to proceed with noncardiac surgery, stating there were no cardiac contraindications or restrictions. (R. 262, 271).

---

⁶ Lyrica (pregabalin) is used to manage neuropathic pain and Cymbalta (duloxetine hcl) is an antidepressant used to treat major depressive disorder and generalized anxiety disorder. *www.pdr.net*

On September 26, 2007, Claimant underwent excisional biopsy of bilateral breast masses, and biopsies of skin lesions on her neck and shoulder. (R. 288-96, 307-22). The pathology report of the biopsies found no evidence of malignancy. (R. 297).

A medication list from Salina Community Clinic ("Salina Clinic") reflects that Claimant had been prescribed Fluoxetine[7], Ranitidine, Ciprofloxacin and Lisinopril on December 6, 2007 by Dr. William Dieker. (R. 358). On January 21, 2008, it was noted at a follow up visit at the Salina Clinic, that Claimant could not tolerate the Fluoxetine, because it "spaced [her] out" and it was discontinued although she still reported symptoms of depression and anxiety. (R. 357-58).

During a February 19, 2008 appointment at the Salina Clinic, Claimant reported depression and anxiety. (R. 354). Claimant also reported that she had been involved in a motor vehicle accident the previous month and had pain that radiated from her hips to her legs. *Id.* Neurologic examination showed she had L5 radiculopathy and was diagnosed with lumbar disc disease. *Id.* She was referred for an MRI of her lumbar spine on March 12, 2008 for bilateral lower extremity radiculopathy and left-sided foot drop. (R. 354, 395). The test revealed well-maintained vertebral body heights and intervertebral disc space heights, normal prevertebral soft tissues, early disc desiccation at T12-L1 and L1-L2 and anterior osteophyte formation at L1-L2 through L3-L4. (R. 395). The impression was that Claimant had moderate hypertrophic changes of the facet joints of L4-L5 and no neural foraminal narrowing or spinal canal stenosis. (R. 352, 395).

Claimant saw Colleen D. Springer, MSW, with the Salina Clinic, on April 17, 2008. (R.

---

[7] Fluoxetine (Prozac) is an antidepressant indicated for the treatment of major depressive disorder (MDD). *www.pdr.net*.

333). Claimant reported that she had severe, chronic pain that made her feel "really sad" and continually anxious. *Id*. However, Claimant reported that things were "much better." *Id*. She said that she had no other problems and was sleeping well. *Id*. Springer noted that Claimant had a flat affect and anxious mood. *Id.* Springer diagnosed Claimant with major depressive disorder, recurrent, moderate, and generalized anxiety disorder. *Id*. Claimant's prescription for Fluoxetine was renewed on this date. (R. 349-50).

Claimant continued to be seen at the Salina Clinic during the rest of 2008 for multiple routine and/or follow-up appointments. (R. 332, 336-48). During these appointments, Claimant had consistent complaints of pain, anxiety, and depression, and she continued to receive medication. *Id*. During one of these appointments, on August 27, 2008, Claimant complained of problems with pain in her leg, back, neck, shoulders, and arms and additionally reported that she had muscle spasms in her arms and hands. (R. 339). On October 29, 2008, Claimant was seen again for complaints of muscle weakness, fatigue, malaise, muscle spasms, and her legs drawing up. (R. 336). She further reported numbness in her legs and hands. *Id*. Rest helped relieve her symptoms, but she reportedly would go "downhill" as the day progressed. *Id*. Other than a refill of medication, no additional treatment or referrals were noted. (R. 336-337).

On January 13, 2009, Claimant continued to be diagnosed at the Salina Clinic with L5 radiculopathy, hypertension, and depression. (R. 376). She was given a prescription for Neurontin and Tramodol for pain. *Id*. The remainder of her prescriptions were refilled. *Id*.

On February 13, 2009, Claimant underwent a cervical myelography for upper extremity radiculopathy. (R. 386-87). The myelogram revealed bilateral lateral extradural defects at C6-C7 and a lateral extradural defect at C5-C6 on the left. (R. 387). The myelogram additionally

9

showed an anteriorly extradural small defect at C4-C5 and a moderate anterior extradural defect at C6-C7.  *Id*.  A CT of the spine performed that day showed Claimant had multilevel mild to moderate facet arthropathy, degenerative joint disease of the sacroiliac joints, and atherosclerotic vascular disease.  (R. 383-85).  An MRI additionally revealed a rounded cystic structure in Claimant's right kidney.  (R. 385).

On February 26, 2009, Claimant was seen at the Salina Clinic for follow-up of her CT tests.  (R. 374-75).  She said she had severe headaches and back pain.  (R. 374).  Hypertension, depression, and degenerative joint disease of her cervical and lumbar spine were noted.  *Id*.  Claimant was using Fluoxetine, Aspirin, Ranitidine, Ibuprofen, Gabapentin[8], Tramadol, and Lisinopril.  (R. 375).

On March 5, 2009, Claimant had an EMG[9] and nerve conduction testing.  (R. 388-93).  It was noted that Claimant claimed she suffered from parasthesias and pain in both hands since January of 2006, as well as pain in her lower back and legs since 2005.  (R. 388).  The test results revealed no evidence of acute or chronic cervical or lumbosacral radiculopathy and no evidence of peripheral neuropathy in the legs. (R. 393).  Testing did show bilateral carpal tunnel syndrome of mild to moderate degree.  *Id.*

John T. Main, D.O., of Tulsa Brain & Spine, evaluated Claimant for generalized pain on April 27, 2009.  (R. 394).  Claimant told Dr. Main that subsequent to a motor vehicle accident several years prior, she had suffered pain in her neck.  *Id.*  Her neck pain radiated into her shoulders, bilaterally, and was slightly worse on her left side.  *Id*.  She reported that she suffered

---

[8]Gabapentin is used for management of neuralgia. *www.pdr.net*.

[9]Electromyogram (EMG) is a graphic record of the contraction of a muscle as a result of electrical stimulation.  Taber's Cyclopedic Medical Dictionary 618, 629 (17th ed. 1993).

low back pain with radiation down her right leg to the bottom of her foot. *Id.* The quality of her pain was dull and aching with associated numbness. *Id.* Ibuprofen gave Claimant minimal pain relief. *Id.* Dr. Main reviewed Claimant's CT myelogram of her cervical and lumbar spine. *Id.* He determined that she had "diffuse degenerative changes throughout the entire spine." *Id.* Dr. Main also remarked Claimant suffered from disk osteophyte complex at the C6-C7 level of her spine, but he felt that it was not the cause of her problems. *Id.* He recommended that Claimant be treated with "conservative therapy including physical therapy and epidural steroid injections at the C6-[C]7 level." *Id.* Because Claimant additionally reported visual problems where her eyes crossed and her vision appeared doubled, Dr. Main scheduled Claimant for an MRI of her brain. *Id.*

After the ALJ rendered her decision on September 2, 2009, Dr. Main reviewed the results of the MRI of Claimant's brain on November 25, 2009, noting "some strange white matter lesions" appeared on the scan. (R. 398). Dr. Main recommended Claimant be evaluated by a neurologist out of concern that Claimant had multiple sclerosis. *Id.*

Agency consultant Seth Nodine, M.D., examined Claimant on March 28, 2007. (R. 208-16). Claimant told Dr. Nodine that she experienced intermittent chest pains that prevented her from working and said that her legs were weak and felt rubbery. (R. 208). She said that her legs felt weaker when her chest was hurting. *Id.* She was unable to climb a flight of stairs because her legs gave out. *Id.* She reported a history of benign and cancerous tumors. *Id.* She had used tobacco for 30 years and had chronic cough. (R. 209).

Dr. Nodine's evaluation showed that Claimant had a full and normal range of joint motion and motion of the spine. (R. 211-13). However, during the range of motion exercises, Claimant

11

told him that she experienced pain in the left shoulder. (R. 210). In describing Claimant's pain on the Chest Discomfort form, Dr. Nodine wrote that Claimant's pain was located at the center of her chest and that it radiated to her left arm. (R. 214). He wrote that Claimant experienced weekly occurrence of pain and pressure that was sharp, stabbing, and intermittent. *Id*. He noted that Claimant reported pain that lasted for minutes, and that it went away on its own or with rest and prayer. *Id*. Dr. Nodine's noted impressions were as follows:

   1. [Hypertension]
   2. GERD
   3. Tobacco abuse
   4. Benign tumors and cancers with ongoing investigation of nipple/with question
      of breast cancer.
   4. Intermittent angina pectoris
   5. Generalized lower extremity weakness and easy fatigue with exertion
      by history and normal exam as above.

(R. 210).

Nonexamining agency consultant Cynthia Kampschaefer, Ph.D., completed a Psychiatric Review Technique ("PRT") on September 6, 2007 and determined Claimant had no medically determinable mental impairment. (R. 274-87). In explanation of her assessment, she marked that Claimant's complaints of depression were not confirmed by medical evidence. (R. 277). Dr. Kampschaefer found that Claimant had no functional restrictions in her activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. (R. 284). In the "Consultant's Notes" portion of the form, Dr. Kampschaefer wrote that Claimant had no medical evidence to show a complaint of or diagnosis of depression, and that there was no prescription for antidepressants. (R. 286).

**Procedural History**

Claimant filed an application dated December 11, 2006 seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 108-10). The application was denied initially on April 16, 2007, and upon reconsideration on November 6, 2007. (R. 63-66). A hearing before ALJ Deborah L. Rose was held February 12, 2009 in Tulsa, Oklahoma. (R. 23-51). By decision dated September 2, 2009, the ALJ found that Claimant was not disabled. (R. 9-22). On January 3, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[10]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[10] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional

13

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ made her decision at Step Five of the evaluation process. At Step One, the ALJ found the Claimant had not engaged in substantial gainful activity since the application date of December 4, 2006. (R. 14). At Step Two, the ALJ found that Claimant had a severe impairment of degenerative joint disease of the spine. *Id.* The ALJ determined that Claimant did not have a

---

capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

14

severe mental impairment. (R. 14-16). At Step Three, the ALJ found that Claimant's impairments, or combination of impairments, did not meet any Listing. (R. 16).

The ALJ, after reviewing the record, determined Claimant had the RFC to perform a full range of light work. (R. 17). At Step Four, the ALJ found that Claimant was not capable of performing past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Claimant could perform, taking into account her age, education, work experience and RFC. (R. 22). Therefore, the ALJ found that Claimant was not disabled from December 4, 2006 through the date of her decision. *Id.*

## Review

Claimant alleges the ALJ erred in failing to consider or include non-exertional impairments in determining Claimant's RFC; in considering and weighing medical opinion evidence; and in assessing Claimant's credibility. Because the undersigned finds that the ALJ's RFC determination is not supported by substantial evidence, the other allegations of error raised by Claimant are not addressed.

At Step Two, the ALJ determined that Claimant had no mental impairment, or if she did, it was non-severe. (R. 15-16). After reaching this determination, the ALJ did not discuss Claimant's claim of disabling mental symptoms in her determination of Claimant's RFC. (R. 17-21). Specifically, at Step Two, the ALJ mentioned only two records showing diagnoses of major depressive disorder and generalized anxiety disorder, finding those records "not consistent with the medical evidence of record" and without supportive "objective evidence." (R. 15). The ALJ also gave "great weight" to the nonexamining consultant's PRT finding no mental impairment, specifically noting Claimant reported "no diagnosis or treatment for depression by a mental health

15

professional or any treating doctor, and no medications being prescribed for antidepressants." (R. 14). No other reference to records indicating depression or anxiety was included anywhere in the ALJ's decision.

Under ordinary circumstances, the reports of examining and nonexamining consultants can be substantial evidence upon which the ALJ can rely in formulating the RFC determination. *Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination). Here, however, the PRT cannot constitute substantial evidence because the reasoning contained therein is directly contradicted by previous and subsequent treatment. *Stephens v. Apfel*, 134 F.3d 383, 1998 WL 42524 at *2 (10th Cir.) (unpublished), the court had multiple problems with the ALJ's decision, but one was the "obvious" problem of using a "stale" 1989 consulting report instead of a current 1993 treating assessment. The Third Circuit addressed the problem of stale evidence in Social Security cases in more detail in *Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 963-64 (3d Cir. 1984). In *Wier*, the claimant was 17, but the ALJ relied on reports that had been completed when he was 11 and 13. *Id.* The court found the reliance on the reports "particularly troubling" because they were "extraordinarily stale." *Id.* Although the lapse of time in the case at hand is not as long, the underlying reasoning and concern remains the same.

Here, the consultant's PRT report cannot constitute substantial evidence under the particular circumstances of Claimant's situation. The PRT was completed in September 2007

with the specific statement that there was no medical evidence showing complaints or diagnoses of depression, as well as no prescribed anti-depressants. (R. 286). However, Claimant had reported depressive symptoms to her treating physicians and had been prescribed an anti-depressant just a few months earlier, in June 2007. (R. 227, 250-51). There is no reference to these records in the report completed by the agency's nonexamining consultant, and therefore it appears that the consultant did not have access to these records at the time she completed her report. In addition, there were numerous records subsequent to the consultant's completion of the PRT reflecting diagnoses of depression and anxiety, together with anti-depressant prescriptions. (R. 332-33, 336-50, 356-58, 374-76). For these reasons, the PRT is not supported by medical evidence. *See Washington*, 37 F.3d at 1442 ("There must be competent evidence in the record to support the conclusions recorded on the PRT form. . ."). Under these circumstances, the undersigned finds that the consulting report was stale and could not constitute substantial evidence on which the ALJ could rely.

A second problem with the ALJ's RFC was her failure to discuss the evidence supporting Claimant's claim of disabling mental symptoms. It is oft-stated law in this circuit that an ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007). A bare conclusion, without discussion, is beyond meaningful judicial review, and therefore an ALJ is required to

17

discuss the evidence and give reasons for the conclusions. *Clifton*, 79 F.3d at 1009.

Here, the ALJ discussed only two records reflecting Claimant's diagnoses of depression and anxiety and concluded they were inconsistent with the other medical evidence. The ALJ did not mention any of the other numerous records indicating Claimant suffered from depression or anxiety or the fact that she was prescribed anti-depressants. (R. 332-33, 336-50, 356-58, 374-76). In reaching the conclusion that Claimant had no mental impairment, the ALJ rejected the two select records even though they appear to be consistent with other medical evidence. This one-sided review is not in keeping with the requirement of *Clifton* that the ALJ must not only discuss evidence supporting her decision, but she must also discuss the uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejects.

Because the lack of substantial evidence supporting the ALJ's RFC determination requires reversal, the undersigned does not address the remaining contentions of Claimant.[11] On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Claimant. The undersigned also emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003) (*citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)).

---

[11] The ALJ also did not have the benefit of a subsequent record from Dr. Main discussing the results of the MRI of the brain revealing "strange white matter lesions, which are of great concern" and could be indicative of multiple sclerosis. (R. 398). This Court, however, has included the new evidence in its consideration of whether substantial evidence supports the ALJ's decision. "[W]e must consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented." *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006). On remand, this evidence will need appropriate consideration.

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 19th day of April, 2012.

Paul J. Cleary
United States Magistrate Judge